

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-113-CR

CYNTHIA SUE HARDEE                                                          APPELLANT

V.

THE STATE OF TEXAS                                                                STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I.  Introduction

In seven issues, Appellant Cynthia Sue Hardee appeals her convictions for theft of property and misapplication of fiduciary property.  We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II. Factual and Procedural History

The friends and family of the complainant, Johnny Bryant, describe him as "slow" and "trusting." According to the State's expert, forensic clinical psychologist Jack Price, Johnny's full scale IQ is 76, leading Price to classify Johnny as "borderline intellectual functioning or borderline . . . mentally retarded."

Johnny withdrew all of the money he had accumulated over thirty years as a grocery store stocker from the store's profit-sharing plan— $111,275.23 after taxes and the early withdrawal penalty.[2] He contributed this money to finance a business with Hardee.

Hardee used $100,000 of the funds to purchase a certificate of deposit, used the certificate of deposit to take out a $100,000 loan, and placed the proceeds of the $100,000 loan into a joint checking account under her name and Johnny's, which she opened with $10,000 from the $111,275.23.[3]

Johnny wrote no checks, but Hardee did. As recounted at trial, among other things, Hardee used the funds in the checking account to pay bills for herself and her friends; to pay for vision check-ups and new glasses; to treat

---

[2] Johnny originally had approximately $151,000 in the plan.

[3] $50 of the $111,275 was used to open a savings account and the remaining $1,225 was taken out as cash.

her daughter and niece and Johnny's daughter to Build-A-Bear parties; to rent furniture and a big-screen television for her home; to have her hair styled and her dog groomed; to buy Christmas decorations for herself and her friends; to buy musical instruments for her family and friends; to send money to her brother's prison account; and to tithe a large amount to her church.[4] A partial list of some of Hardee's expenditures (less benefits received by Johnny), according to the State's forensic accountant's testimony and exhibits at trial, is as follows:

- Vehicles & Trailers:          $26,822.94

- Alpha Excavating:          $15,206.00

- Crossroads Baptist Church:          $11,627.40

- Wal-Mart:          $2,391.22

- The Music Center          $1,855.52

- ABC Distributors:          $1,344.15

- Doctor Visits:          $1,087.59

- Brookshire's:          $994.35

- Credit Card Payment:          $700.00

- Lifeway Christian Store:          $699.12

---

[4] The record reflects that she also sold her van to Johnny's ex-wife and used Johnny's funds to purchase another car for herself.

- Christie Wethington (scrapbooking):    $414.05

- Build-A-Bear                           $313.41

- Hair Cut:                              $45.00

- Hollywood Hounds:                      $35.64

- Blockbuster:                           $30.03

- Country Candles & Fans:                $29.73

- Azle Jr. High (Hardee's daughter):     $20.00

- American Craft Mall:                   $14.33

Johnny and Hardee never started a business. Within three months, the funds were gone,[5] and Johnny appeared on his sister's doorstep with two garbage bags containing his possessions, homeless. The State charged Hardee with theft of property valued at $20,000 or more but less than $100,000, and with misapplication of fiduciary property valued at $20,000 or more but less than $100,000.[6] A jury found Hardee guilty on both counts and assessed

---

[5] Johnny withdrew his funds from the profit-sharing account in October 2002; the money was gone by January 13, 2003.

[6] *See* Tex. Penal Code Ann. §§ 31.03, 32.45 (Vernon Supp. 2008). Both offenses are third-degree felonies. *See id.* §§ 31.03(e)(5), 32.45(c)(5). A third-degree felony is punishable by a term of imprisonment of not more than ten years or less than two years and a fine not to exceed $10,000. *Id.* § 12.34 (Vernon 2003).

punishment at five years' confinement on each count (to run concurrently) and a $10,000 fine on each count. This appeal followed.

### III. Legal and Factual Sufficiency

In her first two issues, Hardee complains that the evidence is legally and factually insufficient to support her convictions. Although Hardee purports to challenge her conviction for misapplication of fiduciary property based on the legal and factual sufficiency of the evidence on the intent element of that crime, *see* Tex. Penal Code Ann. § 32.45(b), she has failed to adequately brief this portion of her first two points.[7] Therefore, we overrule this portion of her first two points.

### A. Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v.*

---

[7] That is, she has failed to provide any argument or legal authority to support this portion of her first two points. *See* Tex. R. App. P. 38.1(i); *Tong v. State,* 25 S.W.3d 707, 710 (Tex. Crim. App. 2000), *cert. denied,* 532 U.S. 1053 (2001); *Mosley v. State*, 983 S.W.2d 249, 256 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070 (1999).

*Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2008). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the

7

factfinder's. *Johnson v. State*, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9. Our deference in this regard safeguards the defendant's right to a trial by jury. *Lancon,* 253 S.W.3d at 704.

## B. Effective Consent

Theft occurs when a person "unlawfully appropriates property with intent to deprive the owner of [the] property," without the owner's effective consent. Tex. Penal Code Ann. § 31.03(a), (b)(1). Consent is not effective if it is given "by a person who by reason of . . . mental disease or defect . . . is known by the actor to be unable to make reasonable property dispositions." *Id*. § 31.01(3)(C).

Hardee argues that the evidence is not sufficient to show that Johnny lacked the ability to give valid consent and to show that she was aware of his inability, if any, to give valid consent.[8]

Hardee first directs us to Johnny's sister's testimony for the proposition that it appeared that Johnny consented to every withdrawal, and she claims that, in the record, the State "acknowledges that [Hardee] obtained consent from [Johnny] for all transactions." Johnny's sister testified as follows with regard to a conversation she had with Hardee, with Johnny present, when she learned about the expenditures:

> Q. And when you were asked about expenditures and stuff, when [Hardee] would tell you what they were on and such, Johnny was agreeing for the most part, wasn't he?
>
> A. It might appear that way.
>
> Q. Well, he did, didn't he?
>
> A. It might appear that way, that he was agreeing.
>
> Q. When she said that Johnny wanted this done, Johnny was saying, "Yeah, I remember that," things of that nature; is that correct?

---

[8] Hardee also states as part of her factual sufficiency point that "[i]n addition to the question of consent, the evidence in this case is also insufficient to show that [Hardee] had the requisite intent to deprive [Johnny] of his property." However, Hardee has failed to brief this contention, so to the extent that she has raised this as part of her first issue, we overrule it as inadequately briefed. *See* Tex. R. App. P. 38.1(i).

A. He made all kinds of comments.

Q. He made what?

A. All kinds of comments.

Q. Well, he never said, "[Hardee] took this money from me," did he?

A. On that particular day?

Q. On that tape.[9]  Anytime during that meeting.

A. No.

But Johnny's sister also testified that Johnny went through first grade twice, had been a special education student, and could not read or do math problems, and that it had taken their mother four years to teach Johnny to drive, even when using the same route every day, which could have reasonably allowed the jury to conclude that any consent Johnny gave was ineffective.  And the other portion of the record Hardee cites to support her proposition that the State acknowledged that Hardee had consent from Johnny does not do so; instead, it only establishes the following:  that Johnny finished high school with a "[s]pecial education diploma"; that when his sister asked him about his plans for businesses, "he just said that it was all being taken care of" and that she

_____

[9] Johnny's sister recorded the conversation on audiotape.  The audiotape was not admitted into evidence.

10

did not know about any specific businesses before the checks came to light; and that Johnny had been married twice, had three children from those two marriages, and was able to support them.[10]

Hardee acknowledges that the State presented a number of witnesses who testified that Johnny was "slow," but she contends that the witnesses she presented who had dealings with Johnny "never noticed any obvious mental problems," supporting her contention that the evidence is insufficient to prove her awareness of his condition.[11] Hardee refers to the testimony of John Webster, the music minister of Crossroads Baptist Church, who testified that Johnny did not seem any different to him from anyone else.[12] But Webster also

---

[10] When asked whether Johnny knew how to pay enough money to assist his ex-wives with his children, his sister replied, "He knew how to hand somebody some money when they asked for it, if he had it."

[11] She also relies on her own testimony that she had no business experience prior to the partnership with Johnny, apparently to account for the abysmal failure of their partnership.

[12] Webster testified,

I believe that Johnny did know what he was doing. Johnny was—you know, every time you saw him when you go into Brookshires, he was always working. He was always doing things just like everybody else. He seemed to have the same type of lifestyle that the rest of us did. He worked, he had a family, he came to church, he learned, and he always had things to talk about, and he always had things that he wanted to do. And so I just considered him to be no different than anyone else.

testified that he did not think Johnny ever joined the church, although he "did attend there for a while."[13] And he testified that when Johnny asked him to attend a seminar on how to become a millionaire because Johnny did not want to go to it alone, he told Johnny that he was not interested.

Hardee also refers to the testimony of Ann Jensen, a Rent-A-Center employee with a history of renting to Johnny. Jensen testified that she never had any concerns about renting property to Johnny and that nothing ever happened to make her think Johnny was incompetent. She acknowledged that if she had thought he was incompetent, she could not have rented anything to him. She stated that she had no reason to believe that he could not read the rental contract, but she also stated that out of all of her customers, "maybe two percent" read the contract and that she did not think Johnny read it "[u]nless he took his copy and read it."

Hardee also refers to the State's expert witness's diagnosis of Johnny as suffering "from a mild defect" to support her effective consent argument. But the State's expert witness testified that Johnny had a "moderate defect in intelligence," not a "mild" defect, and he testified that based on his evaluation

---

[13] Elsewhere, the record reflects that Hardee wrote an $11,000 check to that church out of Johnny's funds as tithing for "J&Cc Enterprises," which she testified stood for Johnny, Cynthia (Hardee), and Candace, Hardee's daughter.

of Johnny, he concluded that Johnny "is defective or intellectually and academically impaired," and that "based on [his] testing and observations of [Johnny], . . . he is not able to manage his own financial affairs." He added that Johnny is easily exploited by others "due to his intellectual defects," that Johnny is dependent on others and "needs and wants and seeks out assurance and guidance from others, and he can be quite easily taken advantage of."

Hardee contends that the State's evidence does not support an inference that Johnny suffers from a defect that leaves him incapable of making a reasonable disposition of his property, "much less that [she] was fully aware of such a defect." And she challenges the credibility of several of the State's witnesses: Sean Trotter, who received some of Johnny's money; Sam Gilley, who volunteered with Johnny for the Texas Girls Choir;[14] and Carol Crumbaker, an officer manager at the Brookshire's where Johnny works.[15]

However, it is the jury's duty to evaluate the credibility and demeanor of witnesses and to determine the weight and credibility of the evidence, not ours.

---

[14] Gilley testified that Johnny could not read the written instructions for setting up the choir's equipment and that his impression of Johnny was that he was slow and "would have a problem with any kind of a complicated transaction." He also testified about Johnny's trusting nature and stated, "I think I could sell John the Brooklyn Bridge."

[15] Crumbaker testified that she concluded that Johnny was "mentally challenged" from her conversations with him and that it would not take very long for anyone to come to this conclusion.

*See Johnson*, 23 S.W.3d at 8–9. And after reviewing the record, we conclude that even without the testimony of these witnesses, there was ample evidence upon which the jury could have concluded that Johnny had a mental defect that would prevent him from being able to make reasonable property dispositions and that, beyond a reasonable doubt, Hardee was aware of it. *See* Tex. Penal Code Ann. § 31.01(3)(C).

First, in addition to the State's expert witness's testimony about Johnny's intellectual capacity and the testimony of Johnny's sister, the jury also heard Nell Dahl, one of Johnny's childhood friends, testify that she has known Johnny for fifty years, that he has been mentally challenged for as long as she has known him, that he was "special" and different mentally ("back then, we said mentally retarded"), that he did not read or write, and that it was obvious that he was mentally challenged.

Then, Alvie Lee Meredith, Johnny's co-worker and roommate, also testified that Johnny was "mentally challenged," that he was a "very trusting" person, and that he would be easily taken advantage of. He stated, "Johnny is the type person, you rob him blind, he'll help you do it." Meredith also testified that while he was Johnny's roommate, Hardee gave them a 32-inch television when she replaced it with the big screen television that elsewhere the record reveals she rented from Rent-A-Center and for which she made at least

14

one payment using Johnny's funds. He testified that he, Hardee, and Johnny went to a furniture store and purchased a bed set for Meredith using Johnny's funds, that it was Hardee's idea more than Johnny's to do so, and that Hardee got the new mattress out of the set and Meredith received her used one.

Additionally, William Sharp, another of Johnny's childhood friends, testified that "you wouldn't have to be around" Johnny for long to realize he was slow. He further testified that it would be easy to pick up on Johnny's slowness "pretty quick" because of "his actions, the way he carried his self [sic], his speech." He also testified that he did not think, as to numerical issues and financial transactions, that Johnny would be able to distinguish between a hundred dollars and a thousand dollars, but that Johnny could do tasks involving repetition. Jack Allen, a former volunteer fireman, testified that "[t]here's no question" that Johnny was mentally challenged because he was slow in thinking and reacting to situations. He stated, "You could talk to him for just a few minutes, and you realized that he wasn't as quick witted as what we'd call normal people."

Finally, Hardee's own testimony provided the jury the opportunity to judge her credibility. She admitted that she signed every check and spent at least $37,000 of Johnny's money, but she testified that she did not intend to steal from Johnny, and that she did not steal from him. She also testified that

15

Johnny was the one who approached her about going into business and wanted a 50/50 partnership; that she always had Johnny's consent to write the checks (alternatively also claiming that some of the money was a loan to her and that Johnny told her that with a 50/50 partnership, she was to have half of the money); and that she had no idea that Johnny was not capable of handling his own money. She specifically testified that she believed Johnny was mentally competent. The jury was entitled to disbelieve some or all of her testimony. *See Johnson*, 23 S.W.3d at 8–9.

Viewing the evidence from numerous witnesses regarding Johnny's mental deficiency in the light most favorable to the prosecution, without reevaluating the weight and credibility of the evidence, we hold that the evidence of ineffective consent is legally sufficient to uphold Hardee's theft conviction. Likewise, viewing the evidence in a neutral light, we cannot say that the record clearly reveals that a different result is appropriate or is necessary to correct a manifest injustice. Therefore, we hold that the evidence is also factually sufficient to uphold Hardee's theft conviction. We overrule Hardee's first two points.

## IV. Closing Arguments

In Hardee's third through seventh points of error, she complains about various aspects of the State's closing arguments at the guilt-innocence and

16

punishment phases of trial. We have reordered them based on the order in which they appear in the record.

## A. Standard of Review

To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 829 (1993); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).

Furthermore, if a jury argument exceeds the bounds of proper argument, the trial court's erroneous overruling of a defendant's objection is not reversible error unless it affected the appellant's substantial rights. Tex. R. App. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000); *Mosley*, 983 S.W.2d at 259. In determining whether the appellant's substantial rights were affected, we consider (1) the severity of the misconduct (i.e., the prejudicial effect of the prosecutor's remarks), (2) curative measures, and (3) the certainty of, depending on the phase of trial, either the conviction or the punishment assessed absent the misconduct. *Martinez*, 17 S.W.3d at 692–93; *Mosley*, 983 S.W.2d at 259. We apply the same considerations to whether the trial court abused its discretion when the trial court sustains an objection and

17

instructs the jury to disregard but denies a defendant's motion for a mistrial. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, i.e., "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial be required. *Id.; see also Simpson v. State,* 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), *cert. denied,* 542 U.S. 905 (2004).

## B. Guilt-Innocence Phase Objections

### 1. Points 5 and 6: Mistrial and Enron Reference

In Hardee's fifth point, she complains that the trial court failed to grant her motion for mistrial after the prosecution allegedly injected facts outside the record to indicate that the prosecutor was an expert and that the jury should follow his recommendations. In her sixth point, she complains that the "trial court erred in overruling [her] objection to prosecutors comparing the present case to the infamous Enron case in an attempt to paint [Hardee] with the same prejudice attached to Enron."

During closing arguments, defense counsel told the jury that "[t]his case is a civil case . . . . This is a civil suit that's being prosecuted in a criminal case . . . . She should be sued . . . . This thing should be sorted out in the civil court because that's exactly what this is." In response to the "civil suit"

18

argument, the following exchange occurred during the State's closing argument:

> [PROSECUTOR]: . . . . Okay. Now, mentioned just a couple—oh, yeah. This is a civil case. *He says this is a civil case.* In all cases,—not all. *In most cases where people get caught in what we call white collar crime or nonviolent crime—*
>
> [DEFENSE]: Objection, Your Honor, in all cases, other cases. It's clearly 401, 403, and 404. It's also prior extraneous.
>
> THE COURT: Sustained.
>
> [DEFENSE]: Have an instruction the jury disregard that argument?
>
> THE COURT: Jury will disregard the last comment of counsel.
>
> [DEFENSE]: We move for [a] mistrial.
>
> THE COURT: Denied.
>
> [PROSECUTOR]: All right. I'll mention to you that, shall we say, *that's an easy out for people who have been caught red-handed, with their hand in the cookie jar, say, oh, well, this is a civil case, let's go to civil court, let's don't have any criminal penalties attached to Enron. No, it's all civil. That's a very common, very common thing*.
>
> [DEFENSE]: Objection, Your Honor, same thing [i.e., 401, 403, 404, and prior extraneous].
>
> THE COURT: Sustained.
>
> [DEFENSE]: Have an instruction jury disregard that.
>
> THE COURT: Jury will disregard the last comment of counsel.
>
> [DEFENSE]: And we move for a mistrial.

THE COURT: Denied. [Emphasis added.]

When a trial court sustains an objection and instructs the jury to disregard the State's argument but denies a defendant's motion for mistrial, the issue is whether the trial court abused its discretion in denying the mistrial. *Hawkins*, 135 S.W.3d at 77. Its resolution depends on whether the court's instruction to disregard cured any prejudicial effect. *Id.* To determine whether the trial court abused its discretion, we balance (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Id.*; *Mosley*, 983 S.W.2d at 259.

In the fifth point, the prosecutor was responding to defense counsel's argument that Johnny should have sued Hardee and that civil court was more appropriate under the circumstances. This was a permissible argument in that it was an answer to the argument of opposing counsel. *See Felder*, 848 S.W.2d at 94–95. Hardee received an instruction to disregard, and an instruction to disregard is presumed to cure the harm. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). It is presumed that the jury will follow a trial court's instruction to disregard a comment. *Id.* at 116. If the instruction cured any harm caused by the improper argument, a reviewing court should find that the trial court did not err; almost any improper argument may be cured by an instruction to disregard.

20

*Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App.), *cert. denied*, 516 U.S. 832 (1995); *Faulkner v. State*, 940 S.W.2d 308, 312 (Tex. App.—Fort Worth 1997, pet. ref'd). Only if the reviewing court determines that the instruction was ineffective does the court go on to determine whether the error was harmful. Tex. R. App. P. 44.2.

Given the volume of testimony to support Johnny's ineffective consent, previously discussed above, and Hardee's own admission that she spent at least $37,000 of Johnny's money, Hardee's conviction was certain even absent the misconduct, if any. Therefore, we hold that the instruction to disregard cured any harm, and we overrule Hardee's fifth point.

Furthermore, as demonstrated above, the trial court did not overrule Hardee's objection to the statement about Enron; it sustained that objection. Therefore, Hardee's sixth point is without merit. Additionally, however, the trial court granted her an instruction to the jury to disregard the comment, and the comment was made in the same vein as the prosecutor's earlier comments about civil trials in response to defense counsel's earlier argument. Because this passing reference, in light of the evidence presented at trial and likelihood of conviction, could not have led to Hardee's conviction, we overrule Hardee's sixth point.

21

## 2. Point 4: Unsworn Testimony and Opinion Objections

In Hardee's fourth point of error, she complains of three statements made by the State during the guilt-innocence phase closing argument:

### a. First Statements[16]

[PROSECUTOR]: . . . . But two weeks later, when she starts spending that money for a purpose other than going into business, *she misapplied it. It's contrary to an agreement*. There doesn't have to be a written agreement. Most people go into business and partnerships on a handshake.

[DEFENSE]: Objection, Your Honor, as to what most people do. Again, he's testifying outside the record.

[PROSECUTOR]: Common, everyday knowledge, Your Honor.

THE COURT: Overruled.

[DEFENSE]: Note our exception.

[PROSECUTOR]: Thank you. Now, it didn't take long for him—for her to starting [sic] spending the money for her own personal benefit. Folks, give her the benefit of the doubt. Maybe she didn't intend to steal it. *I think she had the whole scheme*.

[DEFENSE]: Objection, Your Honor, as to what counsel thinks.

[PROSECUTOR]: I think the evidence will show—I'll rephrase. I think the evidence will show—

[DEFENSE]: May I have a ruling on my objection, Your Honor?

---

[16] Hardee lists these as second of her three complained-of sections under her fourth point.

THE COURT:  It's overruled because he didn't say anything.

[PROSECUTOR]:  I think the evidence—

[DEFENSE]:  Objection, Your Honor.  He says—you know, it's his opinion.

[PROSECUTOR]:  My opinion of the evidence, Your Honor.

[DEFENSE]:  Opinion of the evidence—

THE COURT:  Overruled as stated.

[PROSECUTOR]:  Now, anything I tell you is what I believe the evidence shows.  Obviously your judgment is 12 times better than mine, so you call it like you see it, and that's the important part.  But—

[DEFENSE]:  May I have a continuing objection to this, Your Honor?  I object to that last statement again.  And could I have a continuing objection on this line?

THE COURT:  Overruled.  And your objection is to—

[DEFENSE]:  Any references to what his thought and his belief in what the evidence shows—

THE COURT:  That's granted and overruled.

[DEFENSE]:  Continuing objection is granted?

THE COURT:  Yes, it's granted. [Emphasis added.]

23

### b. Second Statement[17]

[PROSECUTOR]:  She's smart enough to handle car deals, put titles together.  She—let me tell you, the woman ain't no dummy.  She wants you to believe she is.  *She's trying to scam you the same way she scammed Johnny*.  To make you think, oh, poor Cynthia, she doesn't know what she's doing.  She sold cars.  Now, when you sell cars, you got to go out on the lot.  You've got to meet the people.  You've got to talk to them.  You've got to know what's on the car.

[DEFENSE]:  Your Honor—

[PROSECUTOR]:  Everybody knows that.

[DEFENSE]:  Objection, Your Honor.  There's no evidence she ever sold cars.  He's testifying outside the record.

THE COURT:  Overruled.  [Emphasis added.]

### c. Third Statement

[PROSECUTOR]:  . . . .  Ladies and gentlemen, 75,239.  That's the number that has been calculated up through this account.  I submit to you, ladies and gentlemen, even if she didn't steal it, she darn sure didn't apply it consistent with the agreement they had to go into business.  So if she wants to say she didn't steal it or I didn't intend to steal it when I was at the bank, then, guess what, *she formed an intent to misapply it later, and she misapplied it contrary to the agreement*.

A partner is a fiduciary.  A commercial bailee is nothing more than somebody that keeps a property for hire like a parking lot or a warehouse or something, so that doesn't really enter into it.  It's just in the law.  So we don't really have that issue.  But what I'm

---

[17] Hardee lists this as first of her three complained-of sections under her fourth point.

here to tell you, ladies and gentlemen, is whether you find her guilty of one count or you find her guilty of both counts, you can do either one, but I submit to you Cynthia Hardee took everything Johnny Bryant had earned or saved or worked for for 40 years. And if we don't protect the weakest amongst our citizens, why do we have a system. People say why don't they do something. You are now the they. And we appreciate your efforts. We will appreciate your verdict, whatever it is, but I submit to you the evidence justifies a guilty verdict on both counts. Thank you. [Emphasis added.]

Hardee argues that the statements in italics above "violated [her] right to the presumption of innocence and her right to a fair trial," are harmful, and require reversal of her convictions.

Hardee's initial objection was to the statement, "most people got into business and partnerships on a handshake," and not to the statement, "she misapplied it. It's contrary to an agreement." That is, her original objection to the first statement was that the prosecutor was testifying outside the record. Because the complaint made on appeal must comport with the complaint made in the trial court, she has forfeited this error, if any. *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004); *Bell v. State*, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 827 (1997); *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990). We overrule this portion of Hardee's fourth point.

25

Hardee then objected to the second statement in this section, "I think she had the whole scheme," and her objection to this statement was that the prosecutor was expressing an opinion. However, "the prosecutor may argue his opinions concerning issues in the case so long as the opinions are based on the evidence in the record and not as constituting unsworn testimony." *Wolfe v. State*, 917 S.W.2d 270, 281 (Tex. Crim. App. 1996); *see also Penry v. State*, 903 S.W.2d 715, 756 (Tex. Crim. App.), *cert. denied*, 516 U.S. 977 (1995); *McKay v. State*, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985), *cert. denied*, 479 U.S. 871 (1986). With regard to the "whole scheme" statement, the prosecutor was beginning to express an opinion that was not completed due to the objection; however, having reviewed the record, we conclude that the opinion reasonably appears to be based upon evidence contained within it.[18] Hence no error occurred in overruling this objection, and we overrule this portion of Hardee's fourth point.

The prosecutor's next comment to which Hardee now objects was to the effect that Hardee was scamming the jury the same as she scammed Johnny.

---

[18] That is, testimony about how Hardee used Johnny's money and Hardee's own testimony, in which she alternatively claimed that she had Johnny's permission to use the money, that some of the money was a loan to her, and that Johnny told her she was entitled to half of the money, could allow the reasonable deduction that Hardee's plan was to take advantage of Johnny and to use his money for her own benefit.

26

However, the record reflects that Hardee's actual objection during closing arguments was that the prosecutor was testifying outside the record again, complaining that there was no evidence that Hardee ever sold cars. Therefore, we overrule this portion of Hardee's fourth point because her complaint on appeal fails to comport with the error complained of at trial. *Heidelberg*, 144 S.W.3d at 537; *Bell*, 938 S.W.2d at 54; *Rezac*, 782 S.W.2d at 870.

The final statement to which Hardee objects was to the effect that she had formed an intent to misapply the money and had done so contrary to the agreement between her and Johnny. However, the only objection that might apply to this statement would be the running objection to opinion testimony or testimony outside of the record that defense counsel secured earlier in the prosecutor's argument. Because this statement clearly is a reasonable deduction from the evidence as seen through the eyes of the State and does not constitute the improper injection of a personal opinion or testimony outside of the record, assuming that Hardee preserved this error, we overrule the remainder of her fourth point.

## C. Punishment Phase Objections

### 1. Point 7: Restitution

In Hardee's seventh point, she complains that the trial court erred by overruling her objection to a portion of the State's closing argument regarding

Hardee's ability to pay back Johnny's losses by injecting harmful, unsworn testimony.

Although Hardee argues that the statement regarding whether she could pay Johnny back is "purely speculative," the issue was raised during the punishment trial. During the punishment phase, Hardee's counsel asked witnesses: "Do you think that resources of the County would be better spent helping her to get her life back together and *pay restitution*[?]" and "Do you think she could live up to and do the conditions of probation, report, pay a fee each month, *pay restitution* . . . [?]" [Emphasis added.] During closing arguments, he told the jury that "[it] could . . . ameliorate some of that punishment by recommending probation, doing certain things, whatever condition the Judge wants to put on her, *including pay restitution* . . . "; that the court could set out a restitution plan; and that they should "[t]hink about the *restitution* [Johnny] can get from her." [Emphasis added.]

During closing arguments, the State responded to the foregoing by telling the jury:

> He said, well we can have a restitution plan, and we can maybe pay back. How much has been paid back in five years? 280 bucks. You've heard them say she's on disability. She can't work. What are the chances realistically, folks, of Johnny Bryant ever getting paid back by Cynthia Hardee? I say they come under the heading of slim and none.

28

The jury had previously heard evidence that Hardee was unable to work because of a disability, that Johnny's money had partly been used to pay her bills, that she was constantly behind on her bills including at the time of trial, that she had returned a few items that could be sold and had refused to return other items, and that it was Hardee's husband who had given Johnny's sister $280. Therefore, the State's argument was permissible as a reasonable deduction from the evidence, i.e., that Hardee would be unable to repay any significant restitution, and as an answer to the argument of opposing counsel. *See Felder*, 848 S.W.2d at 94–95. We overrule Hardee's seventh point.

## 2. Point 3: Community Expectations

In Hardee's third point of error, she complains that the trial court erred by overruling her objection to the italicized portion of the following exchange:

> [PROSECUTOR]: . . . . But my question is, where does the conduct of a person who steals everything a mentally challenged person has and has ever accrued in a savings plan fall on that range of punishment [between stealing $75,000 from a large company such as General Motors, which might not notice it in its bottom line, and a "mom-and-pop" pizza place that could significantly impact its ability to do business]? I submit to you a fair consideration of those facts would indicate that it's obviously at the upper end. And here again, not because it's [Hardee]. It could be anybody else. *And we don't want this to happen again. We want people to read in the media. We want people to hear about it on television. We want people to know.*

29

[DEFENSE]: Objection. This is not a proper plea for law enforcement and arguing that they should consider community standards or actions or what's in the paper, Your Honor.

THE COURT: Overruled.

[DEFENSE]: That's improper. May I have a continuing objection on that?

THE COURT: Granted. [Emphasis added.]

Hardee argues that the State's comments "constituted an improper plea for law enforcement because the jurors were asked to consider community standards when assessing punishment" and that the "extremely prejudicial nature of this type of argument" requires our reversal of the jury verdict.

Hardee asserts and the State acknowledges that it is improper for the State to argue "that the community or any particular segment of the community expects or demands either a guilty verdict or a particular punishment." *Borjan v. State*, 787 S.W.2d 53, 56 (Tex. Crim. App. 1990). Put another way, "a jury argument referring to the expectations or demands of the community for a particular result constitutes reversible error . . . ." *Bothwell v. State*, 500 S.W.2d 128, 130 (Tex. Crim. App. 1973). In *Cortez v. State*, the court of criminal appeals gives numerous examples of improper jury argument based on community expectations and sums up the impropriety as follows: "[These] above arguments have been disapproved by this Court because the effect of the

language used was to ask the jury to convict or punish the defendant upon public sentiment or desire rather than upon the evidence that the jury had received."[19] 683 S.W.2d 419, 421 (Tex. Crim. App. 1984). The impropriety is not in asking the jury to be the voice of the community but in asking the jury to lend its ear to the community. *Id.* This impropriety is also distinguishable from proper pleas for law enforcement, including the relationship between the jury's verdict and the deterrence of crime in general. *Borjan*, 787 S.W.2d at 55.

The prosecutor's argument in this case, basically that the State wanted the community to hear about this verdict so that this behavior would not occur again, is *not* an argument calling upon the jury for a punishment because the

---

[19] These examples include:

> The people of De Soto are asking the jury to convict this defendant. The people of this community expect you to put this man away . . . . I tell you, the people of Matagorda and Jackson counties are expecting you to do your duty in this case and assess the defendant's punishment at death. . . . Look at this courtroom — it is crowded with Polk County people, demanding the death penalty . . . . The people are present in this courtroom to see that this defendant gets punished . . . . The will and wish of every law abiding citizen of Commanche County wants a verdict of death . . . . The people of Nueces County expect you to put this man away . . . . The jury ought to convict the defendant because the people of Denison desire it.

*Cortez*, 683 S.W.2d at 421 (citations omitted).

community demands it. It is closer to asking the jury to be the voice of the community, rather than asking it to lend its ear, or to a proper plea for law enforcement. Therefore, we hold that the trial court did not err by overruling Hardee's objection, and we overrule her third point.

## V. Conclusion

Having overruled all of Hardee's points, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: CAYCE, C.J.; MCCOY and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 18, 2009